In the Matter of JACOB MILLSTEIN, an Attorney, Respondent. CO-ORDINATING COMMITTEE ON DISCIPLINE OF THE ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, THE NEW YORK COUNTY LAWYERS' ASSOCIATION AND THE BRONX COUNTY BAR ASSOCIATION, Petitioner.

First Department, March 10, 1966.

*Angelo T. Cometa (James J. Fitzpatrick* with him on the brief), attorney for petitioner.

*Leonard Feldman* of counsel *(Eiber, Okin, Rafsky & Feldman,* attorneys), for respondent.

*Per Curiam.* The petition herein of the Co-ordinating Committee on Discipline preferred 13 charges against respondent, of which one was withdrawn during the hearings before the Referee. The Referee's report substantially sustains charges 1, 2, 3, 7, 11 and 12 and finds the remaining six charges not proven. Petitioner moves for an order confirming the report, except to the extent that it fails to sustain charges 5 and 8; as to those charges disaffirmance is sought.

Respondent was admitted to practice on April 20, 1931. Charges 1, 2 and 7 arise from his relationship with Irving Dansker and Bert G. Sapot, two young lawyers admitted to practice in March, 1958. Dansker and Sapot both resigned from the Bar in May, 1961 and later that year pleaded guilty to the charge of soliciting on behalf of an attorney and were placed on probation.

After graduation from law school Dansker worked for respondent's firm, which had offices at 320 Broadway in Manhattan. In the Spring of 1958 he and Sapot, who was working in another law office, formed a partnership and in late Summer opened an office on Second Avenue between 120th and 121st Streets. Thereafter they became attorneys of record in a large number of personal injury cases which they referred to respondent for prosecution and settlement, the legal fees, after reimbursement of respective expenses, being divided equally between their firm and his.

According to the testimony of Dansker and Sapot they had engaged in a continuous course of solicitation of claims, and the substance of the first charge against respondent is that their improper activities had been undertaken at his suggestion and carried on with his guidance and financial assistance. Among the expenses taken into account in the division of fees, Dansker and Sapot testified, were not only commissions to tow truck operators and auto body repairmen for obtaining cases, but also — which is the subject of charge 2 — payments by respondent to insurance company personnel for the purpose of influencing settlements. Charge 7 accuses respondent of himself requesting

two of the tow truck operators to solicit for him after he had been informed by Dansker and Sapot that they had decided to cease soliciting.

The record supports the Referee's conclusions regarding this group of charges. Conceding that he " should have noticed that the number of cases being referred to the partnership by Dansker and Sapot was large for two young lawyers who had only recently started in practice ", respondent would seek to limit his guilt to a lack of care in failing to inquire into their sources of business. Such a limitation is in our opinion inconsistent with the evidence, which on this group of charges discloses sufficient corroboration of the narrative of Dansker and Sapot to warrant its acceptance in pertinent essentials.

Respondent had one partner, whose time, unlike his, was mainly devoted to trial work, and their legal staff was a small one. Respondent's relationship with Dansker and Sapot was of an unusual closeness, if one may judge, among other things, by undenied testimony that at his instance some Dansker and Sapot letterheads were prepared on which respondent's address is indicated as their " downtown office " and his telephone number as their " downtown " number. That respondent was totally ignorant of the sources of the large volume of cases Dansker and Sapot so rapidly accumulated would seem a most generous inference. But other parts of the record negate it. Noteworthy is respondent's unwillingness to meet the allegation of payments to insurance company personnel beyond denials in general terms.

According to Dansker and Sapot respondent had told them that when he made such payments he would report the amounts to them " by little phrases ", to quote Sapot's testimony, " such as special investigations, or special disbursements, or extraordinary disbursements, or unusual investigation, and when we would see one of those phrases we would know that he paid off a man in the insurance company." Letters from respondent's firm containing such phrases were introduced in evidence, but although respondent denied that the letters referred to payments to insurance company adjusters, he made no attempt to explain what expenses the amounts stated in the letters represented; nor could attorneys in his office do so. Among the asserted recipients of such payments was one whom respondent had identified for Dansker and Sapot by name and company, according to their testimony, but respondent failed to call him although stating they were friendly. Sapot's testimony that respondent had met with the tow truck operators and asked them to solicit directly for him was adequately confirmed, not

alone by them, but by a client one of them had referred to respondent. Here, too, we note, respondent failed to call an employee of his firm said by Sapot to have attended the meeting.

Charge 3, in our view, was not proven as alleged. Admittedly respondent deposited in the bank account of an insurance company employee, $100 on May 31, 1960, $150 on June 10, 1960, and $350 on June 21, 1960. It is charged that these payments had the effect of corruptly influencing him in connection with settlements of personal injury claims negotiated by respondent with his company. The insurance company employee testified that he had certain settlement powers, but there is no showing that the payments, which he said were loans to him, had actually influenced settlements in the past or that respondent had claims pending with the insurance company when the payments were made. But we may not ignore these facts — that deposits in a bank account are an unusual way of making loans, and no notes were given; that the employee could not remember why he needed the money; that the money was not repaid until after the employee had appeared before the Co-ordinating Committee; and that respondent chose not to testify about the circumstances of the loans. His failure to offer any explanation evidences a reprehensible lack of the candor and good faith expected from a member of the profession.

Charges 11 and 12 relate to respondent's failure to file, or join in the filing of, closing statements pursuant to the applicable rules of this court in effect before July 1, 1960. The Referee's interpretation of the then rules is correct, and respondent was required to file closing statements in such circumstances; but as we are aware that the different interpretation on which respondent testified he relied was shared by a number of others at the Bar, we think it proper that these two charges be disregarded.

In refusing to sustain charges 5 and 8 the Referee commented upon the lack of corroborating proof. Contrary to petitioner's contention, we do not think the comment indicates that the Referee was applying a standard of proof more rigorous than that required in a disciplinary proceeding. We are not persuaded to set aside his disposition of these charges, since they hung on the credibility of respondent and his accusers, all of whom testified before the Referee, and find it unnecessary to detail them.

The seriousness of respondent's misconduct requires no elaboration. (See *Matter of Rothenberg,* 18 A D 2d 397; *Matter of Levine,* 254 App. Div. 165; *Matter of Bennett,* 20 A D 2d 218, affd. 15 N Y 2d 645; *Matter of Gladstone,* 16 A D 2d 512, 515;

*Matter of Benjamin,* 13 A D 2d 221.)  Respondent should be disbarred.

BOTEIN, P. J., BREITEL, STEVENS, EAGER and STEUER, JJ, concur.

Respondent disbarred.